(650 P.2d 738)
No. 53,557

LEVI STRAUSS & CO., *Appellant,* v. JOHN SHEAFFER and SHEAFFERS
LIMITED, INC., *Appellees.*

Opinion filed September 10, 1982.

*John T. Conlee,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellant.

*Richard H. Seaton,* of Everett, Seaton, Knopp & Thompson, of Manhattan, for the appellees.

Before SWINEHART, P.J., SPENCER and MEYER, JJ.

SWINEHART, J.: This is an appeal by plaintiff Levi Strauss & Co. from the judgment of the District Court of Riley County in favor of defendants John Sheaffer and Sheaffers Limited, Inc., on their counterclaim for damages resulting from a breach of an exclusive dealership contract.

This action was originated by plaintiff, Levi Strauss & Co. (hereinafter referred to as Levi), for collection of an account. Defendants, John Sheaffer and Sheaffers Limited, Inc. (hereinafter referred to as Sheaffer), filed three counterclaims. Prior to trial, the parties settled the original collection claim and two of the counterclaims. After a trial to the court on Sheaffer's remaining counterclaim, which alleged the breach of an exclusive dealership contract, Sheaffer was awarded damages in the amount of $42,347.50. Levi appeals and raises the following issues: (1) Whether the trial court erred in holding that plaintiff Levi was estopped from asserting the defense of statute of limitations; (2) whether the trial court erred in finding that Sheaffer filed his counterclaim within a reasonable time after the expiration of the circumstances upon which the estoppel was based; and (3) whether the trial court erred in awarding to Sheaffer as damages profits lost between 1972 and 1976 as a result of Levi's sales to a competitor contrary to an exclusive dealership agreement.

In 1968, Sheaffer opened a men's store in the Aggieville area of Manhattan. Sheaffer initially did not carry Levi's products.

Shortly after the Manhattan store opened, Ed Clark, a Levi salesperson, called on Sheaffer. In late 1968 or early 1969, Clark agreed to sell the Levi line to Sheaffer. Clark told Sheaffer not to worry about competition because he (Clark) "controlled his territory" and "there will be no [competing] stores as long as you buy up to your credit limit." At that time Sheaffer's credit limit was $1,000 per month. In anticipation of becoming the sole dealer for Levi jeans and other products in the Aggieville area, Sheaffer discontinued his complete line of men's clothing and emphasized the sale of jeans. The store was remodeled so as to complement that type of market.

Ed Clark, the Levi salesperson who originated and serviced Sheaffer's account for approximately one year, was later assigned to another sales territory. Thereafter, other Levi salespersons continued to call on and sell Levi products to Sheaffer. Clark was first replaced by Ozzie Secrest, and then in May of 1971 by Mike Gaddy. Gaddy was replaced in April of 1972 by Bob Freerich. Sheaffer reminded each salesperson that Ed Clark had set the store up and had agreed that it would be the only Levi outlet in Aggieville so long as Sheaffer bought up to his credit limit. Neither Clark nor any salesperson who was assigned to Sheaffer's account after Clark left ever specifically told Sheaffer that they would not work to ensure that he had the exclusive dealership for Levi's in Aggieville.

In early 1971, Ozzie Secrest, a Levi salesperson who serviced the Manhattan area for approximately ninety days beginning in January of 1971, opened a new account at Ballard's, a sporting goods store located in Aggieville. Upon discovering the Ballard's account, Sheaffer spoke with Mike Gaddy, who had since replaced Secrest. In their meeting held in June of 1971, Sheaffer told Gaddy that the Ballard's account was in violation of his right to an exclusive dealership in Aggieville. Gaddy in turn told Sheaffer that it was not company policy to grant exclusive dealerships. Gaddy, however, also told Sheaffer that he would check with Clark. Clark, who was then selling in the Lawrence area, told Gaddy that he never granted an exclusive dealership to Sheaffer.

The extent of competition, if any, from Ballard's was negligible. Nevertheless, dissatisfied with the responses of Gaddy and Clark, Sheaffer complained in writing to Norm Owen, the re-

gional credit manager for Levi, in a letter dated June 22, 1971. Sheaffer recited his agreement and demanded an explanation. No response on the merits of his complaint was ever made, although Owen did refer Sheaffer to the Dallas marketing office.

In the fall of 1971, General Jeans, a retail outlet for jeans, began selling Levi products in Aggieville across the street from the Sheaffer store. The Levi merchandise sold there was purchased by General Jeans at its outlet in Lawrence from Ed Clark, whose territory no longer included Manhattan. Clark made the sales to General Jeans in Lawrence with knowledge that the merchandise would be transported to Manhattan for sale at the Aggieville store.

When General Jeans opened across the street in the fall of 1971, Sheaffer and his salesperson, Patty Miller, complained to Gaddy. He said that he would look into the matter and investigate it, that he knew nothing about it, and that as far as Gaddy was concerned, Sheaffer's was the only account for Levi in Aggieville. He said he would take care of the matter.

Several months later, Sheaffer concluded that Gaddy was not getting anything done, and therefore Sheaffer began directing his complaints to Gaddy's supervisor, Dick Long, in Dallas. Long did not respond to Sheaffer's complaints.

In the meantime, Sheaffer continued to complain to each and every Levi salesperson who serviced his account. He also increased his purchases of Levi products. During the late summer and early fall of 1973, Sheaffer spoke repeatedly by telephone with Norm Owen, whom he considered to be a powerful person within the Levi organization. In each conversation he complained about the sales to General Jeans being in violation of his exclusive dealership agreement. Initially, Owen said he didn't know anything about the store across the street. Eventually, Sheaffer flew to San Francisco to discuss the matter with Owen. At their San Francisco meeting in November of 1973, Owen told Sheaffer that he would look into the matter and take care of it. Credit terms to Sheaffer and his proposed store expansion were also discussed. After this meeting with Owen, Sheaffer continued to purchase Levi products at an increasing rate.

At no time did any representative of Levi tell Sheaffer that Levi was refusing to terminate General Jeans. Eventually, Sheaffer drew that conclusion himself. By May, 1974, Sheaffer was aware

that Levi had not done anything about the General Jeans situation. He continued to complain, however, to Levi's salespersons. In 1975, Sheaffer concluded that Levi was not going to take the necessary action. At no time did any representative of Levi expressly deny Sheaffer's claim of an exclusive dealership.

Throughout the period from June, 1971, to sometime in 1975, Sheaffer remained optimistic that Levi would act upon his complaints about General Jeans. His purchases increased between 1971 and 1973 and continued at substantial, although lesser, figures in 1974, 1975, and early 1976. During all these years, Sheaffer was dependent upon Levi as a major source of merchandise, and was at the same time in a progressively weaker financial position.

This action was originally filed by Levi on April 28, 1976, and Sheaffer's counterclaim was filed June 18, 1976. The trial court found that defendant was led not to sue for the breach of the exclusive dealership agreement by the actions of the Levi representatives, and Sheaffer's reliance upon those actions was reasonable under the circumstances. The trial court therefore found Levi to be estopped from asserting the defense of statute of limitations for a reasonable period of time after Sheaffer might reasonably have concluded that Levi would not act to remedy its breach. The trial court found that Sheaffer could not reasonably have concluded any earlier than January, 1975, that Levi was not going to honor its agreement, and that Sheaffer's counterclaim, filed in June of 1976, was filed within a reasonable time thereafter.

The competition from General Jeans had a devastating effect on Sheaffer's business. The trial court found that Sheaffer sustained substantial losses of profits, which he would have realized had Levi complied with the agreement while selling its products to Sheaffer, and that it was reasonably within the contemplation of the parties at the time of contracting that substantial profits would be lost if Levi breached the agreement by selling to a competitor such as General Jeans.

The trial court awarded Sheaffer $39,070 as damages for lost profits and $3,277.50 as damages as a result of his cost of remodeling the store to enable him to stock and display more Levi merchandise. Such remodeling was done in reliance upon the exclusive dealership agreement between September, 1971, and

February, 1972, and was of no value to Sheaffer after Levi defaulted and Sheaffer ceased to carry Levi's products.

Levi appeals the trial court's decision, challenging the court's ruling on the estoppel issue and on the award of lost profits. Levi does not, however, challenge the finding that an exclusive dealership contract existed and that Levi committed a minor breach of the agreement in the spring of 1971 by its sales to Ballard, and committed a major breach commencing in the fall of 1971 by its sales to General Jeans.

Levi first contends that the trial court erred when it concluded that equitable estoppel prevented Levi from interposing the defense of statute of limitations which would have been a complete bar to any recovery by Sheaffer. The parties agree that K.S.A. 60-512(1), the three-year statute of limitations, is applicable to this case.

In *Bowen v. Westerhaus,* 224 Kan. 42, 45-46, 578 P.2d 1102 (1978), the court reviewed the law concerning equitable estoppel:

"The plaintiffs pled that defendants were estopped to take advantage of the statute [of limitations]. The doctrine of equitable estoppel is based upon the principle that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon. (*Maurer v. J. C. Nichols Co.,* 207 Kan. 315, 485 P.2d 174 [1971].)

"This court has further said:

" 'The doctrine of equitable estoppel requires consistency of conduct, and a litigant is estopped and precluded from maintaining an attitude with reference to a transaction involved wholly inconsistent with his previous acts and business connection with such transaction.' (*Browning v. Lefevre,* 191 Kan. 397, Syl. ¶ 2, 381 P.2d 524 [1963].)

" '. . . One who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement. . . .' (*In re Morgan,* 219 Kan. 136, 137, 546 P.2d 1394 [1976].)

" '. . . Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. . . .' (*United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 527, 561 P.2d 792 [1977].)"

In *Rex v. Warner,* 183 Kan. 763, 771, 332 P.2d 572 (1958), the court stated:

"It is a legal maxim well understood that nothing can interrupt the running of the statute of limitations, and it is commonly stated without any qualification. Courts, however, have ingrafted upon such statutes an exception based upon estoppel. Generally speaking, actual fraud in the technical sense, bad faith, or an attempt to mislead or deceive is not essential to create such an estoppel; to invoke the doctrine, the debtor or defendant must have done something that amounted to an affirmative inducement to plaintiff to delay bringing the action. (*Railway Co. v. Pratt* [73 Kan. 210, 85 Pac. 141]; *Pessemier v. Zeller* [144 Kan. 726, 62 P.2d 882]; *Cole v. City of Kanapolis* [159 Kan. 304, 153 P.2d 920]; 53 C.J.S., Limitations of Actions, § 25, p. 966; 34 Am. Jur., Limitation of Actions, § 412, p. 324.)"

## The court continued:

"It was within plaintiff's domain to ascertain why the defendants refused to perform and where the means of knowledge with respect to his rights or liabilities are available to him, he may not ignore the requirement of due care and at the same time invoke the doctrine of equitable estoppel. That doctrine is not available for the protection of one who has suffered loss solely by reason of his own acts or omissions. Equity aids the vigilant and not those who slumber on their rights. (30 C.J.S., Equity, § 100, p. 499.)" pp. 771-772.

## In *Coffey v. Stephens,* 3 Kan. App. 2d 596, 598, 599 P.2d 310 (1979), this court stated:

"One general statement of the doctrine which runs throughout the cases in which it is asserted is that a defendant, who has acted in such a fashion that his conduct is sufficient to lull his adversary into a false sense of security forestalling the filing of suit until after the statute has run, will be precluded from relying on the bar of the statute."

## See also *Safeway Stores v. Wilson,* 190 Kan. 7, 372 P.2d 551 (1962).

In the present case, the trial court made the following conclusion concerning the evidence proving equitable estoppel:

"The Court, in considering the evidence, has found that Levi, through its salesmen, caused the defendant John Sheaffer to believe in his initial encounters with them and his subsequent encounters that he would have an exclusive dealership as far as the Levi line was concerned. While it is true the evidence does not show express promises were made to Sheaffer by the salesmen, it is, in the Judgment of the Court, that one must reasonably conclude that Sheaffer was led to believe that he was to have the exclusive right to sell Levis in the Aggieville, Manhattan, Kansas, area. Perhaps most damaging to the plaintiff's position that no exclusive dealership was intended is the failure of the Levi sales representatives or administration to disclaim Sheaffer's claim of exclusive dealership. The failure of Levi representatives to specifically advise Sheaffer that his claim was not well founded was, in the Judgment of the Court, a reasonable basis for Sheaffer to conclude that the plaintiff would eventually act upon his complaint as to the breach of the agreement. This belief is important not only insofar as the existence

of the agreement is concerned, but likewise is of import insofar as Sheaffer's claim of estoppel insofar as the claim being barred by the Statute of Limitations."

Levi contends that the above conclusion is insufficient to support a finding of equitable estoppel and argues that more is needed than an omission or a failure to disclaim Sheaffer's claim by Levi salespersons in light of Sheaffer's persistent complaints. In *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 527, 561 P.2d 792 (1977), however, the court held: "A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, *or silence* when it had a duty to speak, induced it to believe certain facts existed." (Emphasis supplied.)

The trial court found that Sheaffer was led to believe by the inaction of the Levi administration and by the statements of the Levi salespersons that his complaint as to the competition would be addressed by Levi, and therefore Sheaffer was justified in not asserting his claim within the period of the statute of limitations.

In *Marcotte Realty & Auction, Inc. v. Schumacher*, 229 Kan. 252, Syl. ¶ 2, 624 P.2d 420 (1981), the court held:

"Upon appellate review this court accepts as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings in the trial court, and disregards any conflicting evidence or other inferences which might be drawn therefrom."

A review of the evidence supports the trial court's finding that Sheaffer reasonably relied upon the actions of the Levi salespersons which provided a reasonable basis for Sheaffer to conclude that Levi would eventually act upon his complaint as to the breach of the agreement. Until 1975, Sheaffer never stopped complaining about the breach of the exclusive dealership agreement. He wrote letters, made telephone calls, and even flew to San Francisco. During this period, no representative of Levi ever told Sheaffer that his claim was hopeless. In 1975, Sheaffer concluded on his own that Levi was not going to honor its agreement. We find that the record supports the trial court's finding that Sheaffer could not reasonably have concluded any earlier than January, 1975, that Levi was not going to honor its agreement granting him an exclusive dealership.

Levi next contends that the trial court erred in finding that Sheaffer filed his counterclaim within a reasonable time after the expiration of the circumstances upon which the estoppel was based. Sheaffer's exclusive dealership agreement suffered a major

breach by Levi in the fall of 1971, when General Jeans opened in Manhattan. The trial court concluded that Sheaffer could not reasonably have concluded any earlier than January, 1975, that Levi was not going to honor its agreement. Levi filed suit for collection of an account on April 28, 1976, and Sheaffer filed his counterclaim on June 18, 1976, a year and a half after he reasonably could have concluded that Levi was not going to honor its agreement. The trial court found this delay to have been reasonable.

In *Rex v. Warner*, 183 Kan. at 769, the court stated:

"No doctrine of equity jurisprudence is better settled than the rule that in the absence of the existence of a statute of limitations, the time in which a party will be barred from relief in a court of equity must necessarily depend to a certain extent upon the facts of each case as they may arise . . . ."

In *Safeway Stores v. Wilson*, 190 Kan. at 12, the court commented: "There is no definite rule governing estoppel which can be applied to every situation." No Kansas case has precisely dealt with the issue of how much time a party has in which to bring an action after an estoppel has expired. The following comment appears in 51 Am. Jur. 2d, Limitation of Actions § 437:

"The matter alleged to constitute the estoppel must have occurred prior to the expiration of the limitation period and not after the right of action had been barred by the running of the statute. However, if there is still ample time to institute the action within the statutory period after the circumstances inducing delay have ceased to operate, a plaintiff who failed to do so cannot claim an estoppel. In any event, an estoppel will be deemed effective only for so long as the creditor reasonably relied upon the defendant's representations as an excuse for not instituting the action. According to some authorities, where a debtor, by his representations, promises, or conduct, is estopped to assert the statute of limitations, the estoppel continues until the plaintiff is given a reasonable time in which to sue. According to other authorities, the estoppel continues, following the expiration of the statutory period, until the creditor is allowed an equal period in which to commence the action."

In the present case, the applicable statute of limitations was three years. Sheaffer brought his counterclaim a year and a half after the expiration of the estoppel. We find the trial court to have been within its discretion in finding the year and a half delay to be reasonable, especially since Sheaffer's claim was brought as a counterclaim, making the issue contemporary rather than stale. We also note that Levi does not allege any prejudice resulting from the delay, such as missing or dead witnesses, or lost or destroyed documents.

Levi's final contention is that the trial court erred in awarding to Sheaffer as damages profits lost between 1972 and 1976 as a result of Levi's sales to a competitor, contrary to their existing exclusive dealership agreement. The trial court found that the effect of General Jeans opening across the street from Sheaffer's and selling Levi merchandise was to gradually shrink Sheaffer's gross sales and gross margin. Since its expenses remained virtually constant, Sheaffer's profits declined. Sheaffer's actual 1972 to 1976 performance showed an aggregate loss of $24,494. Had Sheaffer's store merely followed national averages in the growth of its sales and the percent of its profits on those sales, it would have shown an aggregate profit of $14,576 for the years 1972 to 1976. But for the opening of General Jeans as a Levi outlet, Sheaffer's store would have realized, the trial court held, at least $39,070 in profits. Profits were calculated through 1976 because Sheaffer purchased merchandise from Levi under the contract until 1976. The trial court also included as damages $3,277.50 which was spent by Sheaffer in remodeling his store so that it could carry and display more Levi merchandise. The court found that the remodeling was done in reliance upon the assurance given to Sheaffer that he would have an exclusive dealership in Aggieville. The court did not, however, include as damages the $8,306.54 remodeling expense incurred by Sheaffer to renovate the store into a general men's clothing outlet from a jeans store.

Levi contends that the trial court's award of lost profits is in error, because the contract was terminable at will. Therefore, any damages incurred after the initial breach are not recoverable. The trial court made the following relevant finding:

"Levi was free to terminate the exclusive dealership agreement at any time. The terms of the agreement anticipated sales would continue so long as Sheaffer purchased up to its credit limits. However, absent a termination of the agreement, it was reasonably within the contemplation of the parties at the time of contracting that substantial profits would be lost if the plaintiff breached the agreement by selling to a competitor such as General Jeans."

The flaw in plaintiff's argument is that Levi did not terminate the agreement. It acted under an oral contract for an exclusive agency to sell a product so long as the purchaser bought up to his credit limit. It did, however, breach the exclusivity portion of the agreement, yet profited by the sales. It therefore should be held accountable for the breach throughout the period of its sales to Sheaffer.

In *Sparks v. Motor Co.,* 85 Kan. 29, 116 Pac. 363 (1911), the court was presented with a breach of a contract giving the plaintiff the exclusive agency for the sale of automobiles. The contract was for a fixed duration. The court held that the proper measure of damages was the amount of profits of which the plaintiff was deprived by the sales made through other agents in his territory. The trial court in the present case specifically relied on the rule as stated in *Sparks.*

In *Vickers v. Wichita State University,* 213 Kan. 614, Syl. ¶ 1, 518 P.2d 512 (1974), the court held:

"Loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties."

In *Butler v. Westgate State Bank,* 226 Kan. 581, 602 P.2d 1276 (1979), the court followed the rule stated in *Vickers,* and added at Syl. ¶ 2:

"Evidence of past profitability is not the sole method of showing lost profits. In weighing the evidence presented, the court should view each case individually and pragmatically, and require the best proof available as to the amount of loss sustained."

In 22 Am. Jur. 2d, Damages § 79, p. 113, the rule is stated as follows:

"The measure of damages for breach of an exclusive contract conferring a right to sell a certain manufacturer's products is the value of the contract at the time of breach, which may be estimated by the anticipated profits if it reasonably appears that they would have been realized if the contract had been carried out and were lost by its breach."

At trial, Sheaffer presented a substantial amount of evidence concerning his damages. His expert was the Dean of the College of Business Administration at Kansas State University. We find the record supports the trial court's finding that defendant suffered lost profits, and the law supports such an award of damages for breach of an exclusive dealership contract. In fact, the trial court commented that Sheaffer's claim for damages as to lost profits was, in all likelihood, understated in the court's opinion.

Affirmed.