(870 P.2d 686)
No. 69,015

SOURCE DIRECT, INC., *Appellee,* v. DONALD J. MANTELL, M.D., *Appellant.*

400

Opinion filed March 18, 1994.

*Douglas M. Greenwald* and *Daniel F. Church,* of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellant.

*Joe L. Norton* and *Steven B. Moore,* of Watson, Ess, Marshall & Enggas, of Olathe, for appellee.

Before GREEN, P.J., BRAZIL and LEWIS, JJ.

GREEN, J.: This case involves a breach of contract action wherein the defendant, Dr. Donald Mantell, appeals the judgment of the trial court awarding the plaintiff, Source Direct, Inc., damages in the amount of $41,823.25.

Source Direct, Inc., (Source Direct) incorporated in Kansas for the purpose of distributing a product called LazyTrim diet system. The shareholders of Source Direct, Edward "Joe" Martin, Rick Jensen, and Richard Waggoner, own at least six different business entities, all of which are involved in the direct marketing of "miracle" diet products.

Typically, Martin obtains a source of vitamin pills, develops literature to support a diet plan using the pills, contracts with a physician to endorse the diet, advances the physician a small amount of money to create a file of patients who have benefited from the diet, forms a new corporation to market the diet, and buys advertising on television or in tabloid newspapers. After about two years, sales usually "go flat," and Martin renames the diet plan, creates a different corporation to sell it, and hires a new physician to act as the endorser.

Dr. Donald Mantell, who earned his M.D. degree in Belgium, operates a family health clinic in Evans City, Pennsylvania, specializing in preventative medicine and nutrition. Mantell claims to be a doctor of homeopathic medicine as well as a member of over 30 professional societies. During Mantell's testimony at trial, however, he admitted that he received his degree in homeopathic medicine from the now defunct "International University in Los Altos, California" following a brief correspondence course and that few, if any, of the professional societies in which he claims membership actually exist.

Mantell became interested in obtaining product endorsement contracts in 1989, and in pursuit of such opportunities, Mantell entered into a medical talent agency agreement with Morton Walker, D.P.M., of Stamford Connecticut, who is the sole proprietor of Freelance Communications Talent Agency. In his business, Walker serves as a medical talent agent for doctors who are seeking endorsement opportunities. He also writes advertising copy for proposed products and ghostwrites books and articles for holistic physicians.

Walker met Mantell in 1988 and proposed that Mantell become involved in a venture translating a French book on herbal medicine into English. Although that project fell through, Walker entered into an agency agreement with Mantell in which Walker was to "negotiate suitable agreements" and "create new projects" for Mantell.

Walker brought a total of six projects for diet products to Mantell under the agency agreement. In one such project, Cal-Block 3000, Mantell permitted his name and forged signature to appear on numerous product advertisements. The ads contained a number of false representations of which Mantell was aware but to which he did not object. In another project, Mantell's endorsement of Finnslim appeared on his office stationery and falsely stated that he had reviewed the diet program. In fact, the endorsement letter was written solely by Walker without any input from Mantell. Again, Mantell did not object and collected his compensation check.

Mantell first became involved with Martin in a project for Metabozene/3X. Ads for the product contained false representations and listed a fictitious office for Mantell in Kansas City, Kansas. Mantell also contracted with Martin to endorse LiquidTrim, and a letter supposedly written by Mantell was distributed that highly praised the product and listed a business address in Kansas City, Kansas. Mantell had no direct contact with Martin in either of these projects, which were negotiated by Walker on Mantell's behalf.

In December 1990, Walker entered into negotiations with Martin for Mantell to endorse LazyTrim. Initially, the LazyTrim project involved another physician, Dr. Kirk, but when sales declined, Martin decided to bring in a new doctor and change the advertising copy. Mantell was to provide his name, photo, and reputation in order to collect his endorsement fee. Walker testified it was his understanding that Martin would be organizing a company later to handle the distribution of LazyTrim if Mantell's endorsement could be obtained. Walker discussed the LazyTrim project with Mantell and then sent Martin a letter on December 14 saying that "it's a deal."

In January 1991, Mantell received a copy of the proposed LazyTrim advertisement, made two minor changes in the text

concerning his medical credentials, and sent the ad back to Walker; however, Mantell requested to see the final proofs before publication. Walker forwarded the ad to Martin, writing that it had been approved as modified by Mantell and said nothing about Mantell wanting to see the final copy. The proposed advertisement that was sent to Mantell referred to Source Direct as Mantell's midwest distributor located in Kansas City, Kansas.

In February and March 1991, the LazyTrim ad with Mantell's endorsement was test run in several markets around the country. On March 7, Source Direct was formally created to handle the distribution of LazyTrim. On March 22, Source Direct issued a $5,000 advance to Walker against the royalties to be paid under the contract.

In early April 1991, the LazyTrim ad ran in the Los Angeles Times, and, shortly thereafter, Mantell told his attorney to terminate the agency agreement with Walker and to have Martin immediately discontinue the LazyTrim campaign. Mantell testified he terminated the agreement because he had received several threatening telephone calls at his Pennsylvania office from people who had seen the ad and because his father saw the advertisement and was very unhappy about his association with LazyTrim.

Martin complied with Mantell's wishes and pulled all of the LazyTrim advertisements using Mantell's endorsement from the market. After Mantell withdrew from the project, Martin had Walker locate another physician who would endorse the product. Dr. Robert Rogers agreed to become the new endorser and substituted his name and photograph for those of Mantell in the LazyTrim advertisements. As of the time of trial, LazyTrim was still being marketed under Rogers' name, and sales of the product had exceeded $3 million.

The trial court issued a memorandum decision in which it determined that, as an agent to Mantell, Walker had the authority to bind Mantell to the endorsement contract; that Mantell had breached the contract; that Source Direct was the proper party plaintiff; and that Source Direct had sustained damages in the amount of $41,823.25.

Mantell timely appeals the judgment of the trial court.

Mantell claims the trial court did not have personal jurisdiction over him because he is not a resident of Kansas. Source Direct

has the burden of proving the existence of that jurisdiction. See *Schlatter v. Mo-Comm Futures, Ltd.*, 233 Kan. 324, Syl. ¶ 4, 662 P.2d 553 (1983).

Moreover, because Mantell is not a resident of Kansas, Source Direct was required to prove that the provisions of K.S.A. 1993 Supp. 60-308(b), the Kansas long arm statute, were satisfied and that the exercise of in personam jurisdiction over Mantell afforded him due process of law under the Fourteenth Amendment. *Davis v. Grace*, 4 Kan. App. 2d 704, 707-08, 610 P.2d 1140 (1980).

K.S.A. 1993 Supp. 60-308(b) states that any person, whether or not a resident of Kansas, submits to the jurisdiction of this state for any cause of action arising from entering into an express contract with a resident of this state to be performed in whole or in part by either party in this state.

Mantell argues he never entered into a contract in Kansas and his performance of the endorsement contract was to be at his office in Pennsylvania. His arguments are clearly contradicted by the facts of this case because he entered into an agreement with Martin to endorse LazyTrim through his authorized agent. Martin is a resident of Kansas, and Source Direct was incorporated under the laws of Kansas. The proposed advertisement sent to Mantell for his approval listed a Kansas address as his midwest distributor. All monies paid to Mantell and his agent were drawn on a Kansas bank. Thus, Source Direct presented ample evidence to show Mantell had entered into a contract with a Kansas resident that was to be performed, at least in part, in Kansas.

Further, in order to satisfy due process requirements in exercising in personam jurisdiction, minimum contacts must exist between the defendant and the forum state. 4 Kan. App. 2d at 709 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559 [1980]). The test for determining whether minimum contacts exist is well established in Kansas case law. It is set forth in *White v. Goldthwaite*, 204 Kan. 83, 88, 460 P.2d 578 (1969):

"[T]here are three basic factors which must coincide if jurisdiction is to be entertained over a nonresident on the basis of transaction of business within the state. These are (1) the nonresident must purposefully do some act or consummate some transaction in the forum state; (2) the claim for relief must arise from, or be connected with, such act or transaction; and (3) the

assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. [Citations omitted.]"

Applying the *Goldthwaite* test to the facts in this case, the trial court correctly determined personal jurisdiction was proper. As stated earlier, Mantell entered into a contract with a Kansas resident that was to be performed in part in Kansas. Furthermore, Source Direct's claim for relief arose directly from a breach of that contract. Source Direct introduced evidence that Mantell had entered into two other contracts in Kansas, the Metabozene/ 3X and LiquidTrim endorsements; had publicly held himself out as doing business in Kansas according to a letterhead and newspaper ads that listed a Kansas City, Kansas, address as Mantell's place of business; and had accepted reimbursements drawn on a Kansas bank for sales that were transacted in Kansas. Although it might have been more convenient for Mantell to try this case in Pennsylvania, there was no evidence of an undue burden placed upon him by hearing the case in Kansas. The prime witness, Walker, would have had to travel from his home in Connecticut in either case. The business records of the corporation were more accessible in Kansas than in Pennsylvania. The circumstances of Mantell's business transactions indicate he purposely availed himself of the laws of Kansas and he has financially benefited from his contacts with this state.

Mantell next argues Source Direct was an improper party plaintiff to this suit. The trial court, however, determined as a matter of law that Source Direct was the proper party plaintiff in this action.

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

Mantell claims Source Direct was not a proper party plaintiff because it did not even exist when he supposedly entered into the endorsement contract. He argues his dealings throughout were with Martin, and at no time did he consider the agreement was made for the benefit of Source Direct. In fact, Mantell claims he never even heard of Source Direct until he was served with notice of this lawsuit. Source Direct counters, saying Mantell's agent was aware a corporation would eventually be formed to assume Mantell's contract.

In the classic case of *Boatright v. Steinite Radio Corp.*, 46 F.2d 385, 388 (10th Cir. 1931), the court held that "[i]f, after it comes into existence, a corporation expressly or impliedly ratifies a contract made for its benefit by its organizers before it was formed, such contract becomes the contract of the corporation and it is entitled to the benefits thereof and is liable thereon." Similarly, in *Wilson v. Harburney Oil Co.*, 89 F.2d 211, 213 (10th Cir. 1937), the court stated that "[a] corporation may expressly or impliedly assume the obligations of a contract which its promoters made for its benefit prior to the date of its organization; and any unequivocal act of recognition will suffice for that purpose."

Citing the rule from *Boatright*, the trial court found that the endorsement agreement was made for the benefit of Source Direct. It further found that by distributing LazyTrim in association with Mantell's endorsement, Source Direct had impliedly ratified the contract and was entitled to its benefits.

Furthermore, Walker, Mantell's agent, unequivocally testified that it was the usual business practice of direct marketing enterprises, like Martin's, to first obtain an endorsement and then organize a distribution company. Walker further stated that he realized at the time of entering into the endorsement contract Martin would be forming a company to assume the contract. Moreover, Walker was authorized to enter into a binding contract on Mantell's behalf. Thus, when the endorsement agreement was made, all of the contracting parties contemplated the agreement would be for the benefit of a yet to be formed corporation.

Mantell's claim that he had never heard of Source Direct is disingenuous for two reasons. First, the proposed advertising copy

sent to Mantell in January 1991 clearly listed Source Direct as his Midwest distributor. Secondly, even after extensive discovery as to the parties in interest, Mantell chose to name Source Direct as the sole defendant in his counterclaim.

Because the trial court's determinations that the contract was made for the benefit of Source Direct and that Source Direct ratified the contract are clearly supported by substantial competent evidence, the trial court was correct in concluding that Source Direct was the proper party plaintiff.

Next, the trial court determined Mantell had breached his endorsement agreement with Source Direct by unilaterally withdrawing his approval of its ad campaign. Mantell argues this finding was in error because he had conditioned his agreement to go forward with the LazyTrim advertising campaign upon his opportunity to see the finished ad copy for approval and upon obtaining samples of the diet pills to try out on his patients.

Parties to a contract can place conditions precedent upon their performance, but they cannot escape liability simply by saying the conditions have not been met. *Barbara Oil Co. v. Patrick Petroleum Co.*, 1 Kan. App. 2d 437, 440, 566 P.2d 389, *rev. denied* 222 Kan. 749 (1977). A complaining party must affirmatively show that "(1) the condition precedent actually failed and (2) because of such failure, the contract will not be performed." Whether a contracting party's refusal to perform was because of a genuine claim that a condition precedent failed is a question for the finder of fact and that finding must be supported by substantial competent evidence. 1 Kan. App. 2d at 440.

The trial court determined there were no genuine conditions precedent to this contract. The evidence showed that in Mantell's two previous contracts with Martin, he did not require inspection of the final ads before giving his approval. Martin made all of the changes in the proposed ad Mantell had requested, and Walker told Martin that Mantell had approved the ads. Walker had the authority to bind Mantell to the endorsement contract.

It is not the function of this court to pass upon the credibility of the witnesses or to reweigh conflicting evidence. *Coble v. Scherer*, 3 Kan. App. 2d 572, 575, 598 P.2d 561 (1979). The evidence showed the contract negotiated by Walker with Source Direct contained no conditions precedent to Mantell's final ap-

proval of the advertising copy. Because no conditions precedent to the contract were broken, Mantell's abrupt withdrawal from the advertising campaign constituted an unjustified breach of contract.

Mantell next argues the evidence was insufficient to support the damage award of $41,823.25. Although the parties argue expectation damages, UCC damage formulas, and the duty to mitigate, these arguments are not applicable. Before evaluating the issue of damages, it would be helpful to analyze exactly what type of damages Source Direct is claiming. We shall limit our discussion to expectation and to reliance interests.

A party who seeks to recover his expectation interest in the contract is asking to be given the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed. Restatement (Second) of Contracts § 344(a) (1981); *Vanderpool v. Higgs*, 10 Kan. App. 2d 1, 3, 690 P.2d 391 (1984). Expectation damages usually consist of lost profits plus any incidental or consequential losses caused by the breach. 22 Am. Jur. 2d, Damages § 45, p. 69.

In Kansas, "loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974); *Levi Strauss & Co. v. Sheaffer*, 8 Kan. App. 2d 117, 127, 650 P.2d 738 (1982). While absolute certainty in proving loss of future profits is not required, a damage award for lost profits cannot be based upon purely speculative or problematic evidence. *Vickers*, 213 Kan. at 620.

Although Source Direct makes arguments concerning expectation damages in its brief, it did not choose to seek expectation damages in this lawsuit. Source Direct failed to present any evidence at trial concerning the loss in profits caused by Mantell's breach.

Next, a party who seeks to recover a reliance interest is asking to be reimbursed for any loss caused by reliance on the contract by being put in as good a position as the party would have been in had the contract not been made. Restatement (Second) of Contracts § 344(b) (1981). Reliance damages are usually sought

as an alternative to expectation damages when lost profits cannot be proven with reasonable certainty. 22 Am. Jur. 2d, Damages § 50, p. 75. Although reliance damages do not include lost profits, they do include expenditures made and property consumed in reliance on the contract. 22 Am. Jur. 2d, Damages § 50, p. 74.

"Courts will allow the recovery of such expenditures if the breach of the contract renders those expenditures valueless to the plaintiff, lost profits cannot be awarded because they appear speculative, and those expenses were foreseeable by the defaulting party at the time the contract was made." 22 Am. Jur. 2d, Damages § 595, p. 660. In *Butler v. Westgate State Bank*, 226 Kan. 581, 602 P.2d 1276 (1979), an aggrieved party was allowed to recover his out-of-pocket expenses incurred as the result of a contract breach but was not allowed to recover lost profits as well. Reliance damages, as with any other type of damages, must be the proximate result of the breach of contract, and damages which are remote, contingent, and speculative in character cannot serve to support a judgment. *Apperson v. Security State Bank*, 215 Kan. 724, Syl. ¶ 7, 528 P.2d 1211 (1974).

Source Direct, in this lawsuit, sought damages based upon its reliance interest in the endorsement contract. By submitting its "Accountants' Compilation Report" to the court, Source Direct, however, requested reimbursement for all of its expenditures connected with the Mantell project.

The question becomes whether there was substantial competent evidence introduced by Source Direct at trial from which the trial court could have reasonably computed a reliance damage award of $41,823.25.

"Generally, in an action for breach of contract, plaintiff must establish the amount of his damages with reasonable certainty, and there can be no award of damages for breach of contract where there is no proof that damages have been sustained by the breach or no evidence by which the amount of damages can be measured." 25A C.J.S., Damages § 162(11), p. 113.

The damages recoverable by an employer when an employee breaches his or her employment contract are usually measured by the cost of obtaining other services equivalent to those promised and not performed, plus any additional foreseeable consequential injury. *Roth v. Speck*, 126 A.2d 153, 155 (D.C. 1956); Annot., 61 A.L.R..2d 1008. In *Winkenwerder v. Knox*, 51 Wash.

2d 582, 320 P.2d 304 (1958), for example, a special sales manager who had been hired to help close out a store breached his contract after only partially performing his services. The court held that when a personal services contract is breached, the aggrieved party may recover the cost of obtaining equivalent service plus any foreseeable consequential costs of the breach, reduced by the amount of wages that remain unpaid to the breaching party. 51 Wash. 2d at 588 (citing 5 Corbin on Contracts § 1096 [1964]).

Applying the above damage formula to this case, the correct measure of damages to Source Direct would be the cost of obtaining the replacement endorser plus any consequential damages minus any royalties still owing to Mantell. The evidence introduced at trial indicated that the cost of securing Rogers' services were minimal and that he was being·paid at the same rate as Mantell. It is impossible to discern from the Accountants' Compilation Report what consequential damages Source Direct incurred from the breach. Source Direct introduced no evidence of such losses.

The trial court, however, awarded Source Direct damages of $41,823.25. The only evidence to support this award was Martin's testimony and the Accountant's Compilation Report. "In order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate thereof." *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, Syl. ¶ 8, 519 P.2d 667 (1974).

During the trial, Martin testified Source Direct was seeking damages of approximately $41,823.25. Martin further testified the Accountant Compilation Report was a summary of how Source Direct arrived at that amount. Martin, however, testified the damage figure of $41,823.25 was based upon the project terminating. He stated:

"[Martin]:  . . . [I]f this project had terminated, and we hadn't scrambled around and found another doctor and gone forward, this is what we would have lost on Dr. Mantell. It's that simple. . . .
"[Cross]:  But you didn't lose it because you did get another doctor?
"[Martin]:  That has nothing to do with Dr. Mantell."

In addition, Martin testified to improperly including in the compilation report a charge Source Direct paid to Dr. Kirk for

a copyright, which had nothing to do with the alleged damages owed by Mantell to Source Direct.

"[Cross]:    So the money you pay him through your copyright, you are now suing Dr. Mantell as part of the damages?

"[Martin]:    Well, I had to buy the copyright to protect myself.

"[Cross]:    That had nothing to do with Dr. Mantell.

"[Martin]:    That may be an error. It is a matter of interpretation I guess. Depends on which side you are looking at it from."

In *Venable*, the Kansas Supreme Court stated: "The jury should not be allowed to merely *speculate* in arriving at damages for loss of use. One who claims damages on account of a breach of contract must not only show the injury sustained, but must also show with reasonable certainty the amount of damage suffered as a result of the injury or breach." (Emphasis added.) 214 Kan. at 50.

Applying the above principles to the award of damages in this case, we conclude the evidence of Source Direct was wholly insufficient to support the award of $41,823.25.

The judgment of the trial court is affirmed, except for the award of damages to Source Direct. Because the evidence was insufficient to support the damage award, the judgment of $41,823.25 is reversed.

Affirmed in part and reversed in part.