(215 P.3d 636)
No. 101,050

MARK CRAVOTTA, D/B/A CRAVOTTA STUDIOS, *Appellee*, v. DEGGINGERS' FOUNDRY, INC., *Appellant*.

Opinion filed September 11, 2009.

*Eric Kjorlie*, of Topeka, for appellant.

*Richard Petersen-Klein*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee.

Before RULON, C.J., and HILL, J., and KNUDSON, S.J.

HILL, J.: In this case, Deggingers' Foundry, Inc., of Topeka, promised in a settlement agreement to manufacture and deliver

some chandeliers and other items to the plaintiff, Mark Cravotta, in Dallas, Texas, by a certain date. The foundry failed to do so. During the trial of this matter, when Tim Degginger claimed Cravotta's failure to forward important electrical system information stopped the foundry from making a timely delivery, the district court ruled the Uniform Commercial Code's statute of frauds barred Degginger from successfully raising such a defense. We must reverse and remand this case because the trial court failed to consider the contract in the commercial context from which it arose, as the Code requires. By relying only on the statute of frauds and not considering the parol evidence statute in the Code, the court erred.

*We note the case history.*

Cravotta engaged the Deggingers' Foundry to make some chandeliers, sconces, and lanterns for installation in a mansion in Texas in April 2003. Cravotta wanted the foundry to make 3 nickel-bronze chandeliers, 8 nickel-wall sconces, and 16 silicone-bronze lanterns. The cost for these items was $106,000, and the parties anticipated a production time of 90 days.

The parties signed a concise two-page contract drawn on Deggingers' letterhead. The essence of their agreement provided a 10-step list of how the parties intended to complete the project:

"By way of outline this contract shall be implemented by:
"1. Contract.
"2. Final shop drawings prepared by Degginger's Foundry, Inc.
"3. Final engineering review of the shop drawings.
"4. Patterns.
"5. Prototypes.
"6. Owner Approval.
"7. Aesthetic sample submittals.
"8. Production.
"9. Product approval.
"10. Shipping to job site."

The rest of the agreement contained terms concerning method of payment and other matters not pertinent to this appeal.

Matters did not go smoothly for the parties, and on June 20, 2005, Cravotta filed a breach of contract lawsuit against Degginger

in Shawnee County. Cravotta alleged he had already paid $79,500 under the contract and Degginger had breached their contract by failing to manufacture the products. Cravotta sought $79,500 in damages plus interest. In response, Degginger admitted it made the contract with Cravotta but alleged the original contract had been modified by a series of subsequent communications and acknowledgments from both sides.

Despite the lawsuit, the parties were still working toward a common goal. For example, Degginger delivered the 16 lanterns to Cravotta even after Cravotta filed the petition. But, we note those lanterns had no wiring or glass. Tension between the parties apparently eased since, instead of going forward with the breach-of-contract case, Cravotta and Degginger reached an agreement to settle the lawsuit and complete the project.

*The parties recite their settlement agreement into the record in district court.*

On February 3, 2006, the district court held a hearing so a record could be made of the parties' agreement. Cravotta appeared at the hearing, but only counsel was present on behalf of Degginger. Cravotta's attorney stated the parties had agreed that Degginger currently owed $62,478.22 to Cravotta under the April 7, 2003, contract. Degginger agreed to complete the eight sconces and three chandeliers. These items would be completed in a manner satisfactory to Cravotta and delivered to him by April 15, 2006. Once the items were completed and delivered to Cravotta, Degginger would be credited $62,478.22 and, for completing the work, Cravotta would pay Degginger the remaining balance owed to the foundry under the contract. Finally, Degginger agreed to pay Cravotta $6,000 for legal fees.

Unfortunately, Degginger did not deliver the sconces and chandeliers to Cravotta by April 15, 2006. Therefore, on May 12, 2006, Degginger filed several motions alleging Cravotta had prevented the foundry from completing the sconces and chandeliers on time because Cravotta failed to provide vital information needed to complete the wiring of the items. Thus, Degginger asked the district court to find that Cravotta had breached the settlement agree-

ment and asked the court to order Cravotta to pay $27,000 to Degginger for completing at least part of the contract. In turn, Cravotta denied the allegations and asked for judgment against Degginger. The question then became which party first breached their settlement agreement.

The district court tried the dispute in April 2008. Tim Degginger, President of Deggingers' Foundry, Inc., testified about all of the work the foundry had completed in compliance with the contract. Because Cravotta could not provide acceptable models or patterns, the foundry had to hand-sculpt some patterns and machine-sculpt the remaining patterns used to create the chandeliers and sconces. After months of discussions and submissions of many drawings, the parties finally agreed on a design that was acceptable to the owner of the house in Texas. Degginger pointed out that for 1 chandelier, the foundry made 33 parts from lost-wax castings, each hand sculpted. The remaining 53 other parts were sand-cast, meaning they were hand carved as well. He said the chandeliers and sconces are at the foundry, essentially complete. The only remaining work to be done on them is wiring and the final polishing. According to Degginger, wiring is the problem.

From the start of the project until the trial to the court, Degginger sought information from Cravotta about the "stepdown transformers" inside the house where the items were going to be placed. According to Degginger, Cravotta never provided this information. In the foundry's view, this information was crucial in order to ensure that the sconces and chandeliers were properly wired and safe to use inside the house. Degginger stated the house in Texas has a very unusual electrical system for a residence — 480-volt, three-phase power, and current at 600 watts. He pointed out that the foundry uses a similar electrical system to melt bronze, 300 pounds in 15 minutes. Such electrical power is very dangerous, potentially lethal. The stepdown transformers lower the current to 220 or 110 volts, single phase. Therefore, wiring of the chandeliers and sconces required expert design assistance, what Degginger referred to as an electrical engineer's stamp of approval on the wiring plans.

In support, the foundry introduced as an example of the parties ongoing communication, a February 28, 2005, e-mail to Cravotta from Janet Zoble, who was hired by Degginger to work with Cravotta in designing the items to be created. It stated:

"Electrical drawings are nearly complete on the chandelier. Detailing will require input from the electrical engineer. I'm sure he will want to know the wattage you intend as well as the size of the breakers dedicated to the chandeliers and sconces. There are 18 bulbs per chandelier; at 25 watts that's 450W each or 900W for the two living room units; at 40W that would be 750W each or 1500W for two. Would you intend any more than that??"

In addition, Degginger introduced an April 11, 2006, letter written by its attorney and sent to Cravotta's attorney stating: "Mr. Degginger advises me that we have completed our part of the metal work and Mr. Cravotta still has some decisions to make."

Degginger also stated that all the work the foundry could perform to finish the sconces and chandelier was finished by mid-March 2006. He acknowledged that under the settlement agreement the foundry was to complete the chandeliers and sconces and deliver them by April 15, 2006. Cravotta did not put on any evidence to rebut Degginger's testimony.

In ruling on this case, the district court was troubled by the fact that neither the April 7, 2003, contract nor the settlement agreement of February 3, 2006, explicitly mentioned Cravotta had a duty to provide electrical information to Degginger. The district court believed that if the need of such information was so significant, the parties should have stated so explicitly in the agreements. Ultimately, the court concluded that if Cravotta had such a duty, the statute of frauds found in K.S.A. 84-2-201 required that it be put in writing and signed by Cravotta. Because that was not done, the district court ruled the statute prevented it from finding that Cravotta had such a duty under the agreements. Thus, the district court found that because Degginger did not complete and deliver the sconces and chandeliers by April 15, 2006, it breached the settlement agreement. Therefore, the court granted judgment to Cravotta in the amount of $62,478.22 (plus interest) and $6,000 in attorney fees.

*We state our standard of review and list pertinent statutes.*

To review this case, we must interpret several statutes. Interpretation of a statute is a question of law over which this court has unlimited or plenary review. See *Genesis Health Club, Inc. v. City of Wichita,* 285 Kan. 1021, 1031, 181 P.3d 549 (2008).

Since this case involves the sale of goods, the Uniform Commercial Code applies. The Code, in many ways, directs parties and the courts to view commercial transactions within the context of the marketplace. One of the Code's purposes is "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." K.S.A. 84-1-102(b). In other words, the Code tries to promote commerce, not inhibit it. Even the section of the Code used by the trial court, K.S.A. 84-2-201(1), points out that some writing is essential, but "a writing" is enforceable even if it omits an agreed upon term:

"Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. *A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.*" (Emphasis added.)

The next section of the Code, K.S.A. 84-2-202, which deals with parol evidence, instructs that commercial contracts must be viewed in conjunction with the parties' course of dealing and the common practices of a particular trade:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing *intended by the parties as a final expression of their agreement with respect to such terms as are included therein* may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) by course of dealing or usage of trade (section 84-1-205) or by course of performance (section 84-2-208); and

"(b) by evidence of consistent additional terms unless the court finds *the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.*" (Emphasis added.) K.S.A. 84-2-202.

*We apply these statutes to this case.*

As with any set of statutes dealing with a common subject, the Uniform Commercial Code must be interpreted in a harmonious fashion. The statute of frauds in Sales Article 2 must be read in tandem with the parol evidence statute. The first deals with the creation of the bargain, the second shows the court what bargain can be enforced.

Both parties admit they entered into a contract for the sale of goods. They also agreed on the quantity of goods to be sold. There was simply no dispute between them about whether there is a binding contract. Therefore, the statute of frauds in K.S.A. 84-2-201 has little bearing when deciding the merits of this case. See K.S.A. 84-2-201(1) and (3) (b) (a contract is not enforceable beyond the quantity of goods shown in the writing or admitted to by the party); *Wendling v. Puls,* 227 Kan. 780, 788, 610 P.2d 580 (1980) (because the parties admitted the existence of the contract in court, K.S.A. 84-2-201 did not prevent the contract from being enforced). Actually, the only dispute between the parties was whether Cravotta had a contractual duty to provide electrical information to Degginger so it could complete construction of the chandeliers and sconces and deliver them to Cravotta by April 15, 2006.

In our view, K.S.A. 84-2-201, as a matter of law, certainly did not prevent the district court from finding that Cravotta had such a duty, even though the parties did not put it in writing. The statute states: "A writing is not insufficient because it *omits* or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." (Emphasis added.) K.S.A. 84-2-201(1). The Official UCC Comment 1 to K.S.A. 84-2-201 states: "The required writing *need not contain all the material terms of the contract* and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." (Emphasis added.) In other words, K.S.A. 84-2-201 does not prevent a court from finding that, based on extrinsic evidence, a written contract contains a term not

explicitly stated within it. But before the court ruled the statute of frauds prevented Deggingers' Foundry from presenting its defense, the court should have first determined if the parties intended their settlement agreement to be their total agreement. In other words, the court should have decided if the contract was integrated.

*It is necessary to determine the intent of the parties.*

We turn again to the Code. If contracting parties intend a writing to be a final expression of their agreement with respect to such terms stated within that writing, then under K.S.A. 84-2-202 such a writing is considered integrated. This means the terms cannot be contradicted by evidence of any prior agreement or contemporaneous oral agreement. But, even so, the terms of an integrated writing may be supplemented by evidence of consistent *additional* terms. Going further, if a writing is completely integrated (*i.e.*, the parties intended the writing to be a *complete and exclusive* statement of the terms of their agreement), the writing cannot be contradicted or supplemented by extrinsic any evidence. A writing is considered completely integrated if the additional terms sought to be added to the writing are such that, if agreed upon, they would have certainly been included in the original contract. See K.S.A. 84-2-202, Kansas Comment 1996, 1-2. In order to determine this, the district court here must make additional findings.

Whether the parties intend a writing as a final expression of their agreement or a complete and exclusive statement of the terms of their agreement are questions of fact for the district court to decide. See K.S.A. 84-2-202, Kansas Comment 1996, 2. In *Blair Constr., Inc. v. McBeth*, 273 Kan. 679, 686, 44 P.3d 1244 (2002), the court said: "Intent is a question of fact to be determined from examining the written instruments and from the facts and circumstances surrounding their execution. [Citations omitted.]" In *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1131 (7th Cir. 1994), under K.S.A. 84-2-202[b], the court concluded the determination of whether a contract is completely integrated is primarily a factual determination that " 'goes beyond the four corners of the contract.' " In *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 763 (10th Cir. 1983), the court held that under K.S.A. 84-2-202,

whether the parties intended a writing to be a final expression of their agreement is a question fact for the district court to decide.

Furthermore, whether extrinsic evidence constitutes a course of dealing, a usage of trade, or a course of performance is a factual inquiry that the district court must undertake. See K.S.A. 84-1-205, Kansas Comment 1996, 2-3; K.S.A. 84-2-208, Kansas Comment 1996, 1; *Aero Consulting Corp. v. Cessna Aircraft Co.*, 867 F. Supp. 1480, 1489-91 (D. Kan. 1994) (determining whether plaintiff's evidence established "course of dealing" under K.S.A. 84-1-205[1]).

Much in the record supports the court finding the duty existed. The course of dealing of the parties highlights their transaction. The original contract of April 7, 2003, recited that one of the agreed steps of production would be "final engineering review of the shop drawings." Degginger's testimony revealed that the parties were almost continuously negotiating about the materials and design of the finished products. Professional drafting was employed. Prototypes would be fashioned and either accepted or rejected. The foundry created models that it either modified or adopted during this manufacturing process. Naturally, safety was also a concern. The chandeliers are massive metal structures that will overhang whatever or whoever may be beneath them. Cravotta intended to install them in a house with a very unusual and potentially dangerous electrical system. We point out the Official UCC Comment to K.S.A. 84-2-202 advises: "[T]he course of actual performance by the parties is considered the best indication of what they intended the writing to mean."

Finally, whether a party's duty under a contract was based on a condition precedent is a question for the finder of fact to decide. *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994).

The district court here made no such analysis, nor did it make findings that would determine the applicability of K.S.A. 84-2-202 in this case. An appellate court cannot make such findings. See *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006) (appellate court may remand for more specific factual findings when it concludes that lack of findings precludes meaningful

review); *In re Estate of Cline*, 258 Kan. 196, 206, 898 P.2d 643 (1995) (appellate court may remand for additional findings when record on review does not support a presumption that the district court found all facts necessary to support its judgment).

Finally, we note the parties agreed at the February 3, 2006, settlement hearing that Degginger would pay Cravotta $6,000 in legal fees. Nothing in the record indicates this obligation was contingent upon some future act. We affirm the district court's judgment of $6,000 to Cravotta for attorney fees. We need not address the remaining issues raised in Deggingers' Foundry's brief.

We remand with directions for the district court to determine if the parties intended their settlement agreement to be integrated, either fully or partially, if the parties made some enforceable subsequent agreement, or if the course of dealing, course of performance between the parties, trade custom, or some trade usage modified the parties' settlement agreement.

Affirmed in part, reversed in part, and remanded with directions.