(281 P.3d 540)
No. 104,916

Rene Dunn, Sandra Dunn, Phillip Dunn, Pattie Peterson, and Linda Knoblauch, *Appellants*, v. Doris E. Dunn, Jeff Breault, Carey Thomas Hoover Breault, Inc., and Lincoln National Life Insurance Company, *Appellees*.

620

Opinion filed May 18, 2012.

*Elizabeth A. Carson*, of Bruce, Bruce & Lehman, L.L.C., of Wichita, for appellants.

*Stephen M. Kerwick*, of Foulston Siefkin LLP, of Wichita, for appellee Lincoln National Life Insurance Company.

*Randall K. Rathbun*, of Depew Gillen Rathbun & McInteer LC, of Wichita, for appellees Jeff Breault and Carey Thomas Hoover Breault, Inc.

Before STANDRIDGE, P.J., MCANANY and ATCHESON, JJ.

MCANANY, J.: The suit that resulted in this appeal was prompted by a stepmother who her stepchildren claim cheated them out of their inheritance. The stepchildren (referred to as the children) obtained what may be a worthless judgment against their stepmother. This suit is against the insurance company and others who, according to the children, were complicit in the loss. The issue before us is whether the district court erred in granting summary judgment in favor of the defendants because the children's claims were barred by the applicable statutes of limitations or statutes of repose.

## STANDARDS FOR SUMMARY JUDGMENT

The parties are well acquainted with the standards for granting summary judgment and our standard for reviewing the ruling on appeal, all of which can be found in K.S.A. 60-256; Supreme Court Rule 141 (2011 Kan Ct. R. Annot. 232); and in *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011); *Kuxhausen v. Tillman Partners*, 291 Kan. 314, 318, 241 P.3d 75 (2010); and *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000). We need not repeat them here, other than to note that our review of the parties' summary judgment motions is de novo.

## THE VARIOUS MOTIONS AND RESPONSES

We turn to the record on appeal for the parties' motions, statements of uncontroverted facts, and briefs which were before the district court. They consist of the following:
4/27/10
Lincoln National Life Insurance Company's (Lincoln National) motion for summary judgment and supporting memorandum which includes its statement of uncontroverted facts.

4/28/10

Jeff Breault's and his securities brokerage firm's (Carey Thomas Hoover Breault, Inc.) motion for summary judgment and supporting memorandum and statement of uncontroverted facts.

6/3/10

The children's response to Lincoln National's motion, their response to Lincoln National's statement of uncontroverted facts, and their own statement of additional uncontroverted facts. (There is no response in the record from Lincoln National to the children's statement of additional uncontroverted facts regarding Lincoln National.)

6/3/10

The children's response to Breault's and his firm's motion, their response to Breault's and his firm's statement of uncontroverted facts, and their own statement of additional uncontroverted facts regarding Breault and his firm.

6/21/10

Breault's and his firm's reply brief to the children's brief in opposition to the motions for summary judgment and their reply to the children's statement of additional uncontroverted facts with respect to Breault.

### BACKGROUND FACTS

Our first task is to identify the uncontroverted facts. The parties' statements of uncontroverted facts do not fully frame the factual background of the case. From their briefs, however, we have put together the following scenario over which we find no disagreement, though the parties have not formally spelled it out pursuant to Supreme Court Rule 141.

Lynn Dunn died on September 12, 1993. He was survived by his wife, Doris Dunn, and his five adult children from a prior marriage—Phillip Dunn, Rene Dunn, Sandra Dunn, Pattie Peterson, and Linda Knoblauch. These children are the plaintiffs in the present suit.

Lynn's will was submitted for probate administration. It directed Lynn's heirs to spend no more than $375,000 to buy an annuity that would provide Doris, then age 59, with income of approxi-

mately $2,500 per month to age 62, and $1,825 per month thereafter for the remainder of her life. Upon her death, the remainder would be divided among his children per stirpes.

Unfortunately, the amount available in Lynn's estate was insufficient to carry out this provision in his will. So securities broker Breault was contacted to obtain an investment vehicle that would come as close as possible to accomplishing Lynn's wishes. Breault proposed replacing the fixed annuity called for in the will with a variable annuity consisting of investments in stocks and bonds, the values of which, and the resulting value of the annuity, would fluctuate with the market. The family agreed, so Doris and the children entered into a family settlement agreement reflecting the change. The family settlement agreement provided for purchase of an annuity policy through Lincoln National. Doris and Phillip were to be the joint owners of the annuity, and Phillip and his four siblings were to be designated irrevocable beneficiaries. The family settlement agreement also provided that Doris and Phillip would determine the initial allocation of the annuity investments and withdrawals. "Thereafter, any changes in the allocation or amount of withdrawals shall be made only upon the joint signature of both of such co-owners."

The district court approved the family settlement agreement on December 5, 1994. Doris and Phillip then purchased the variable annuity through Breault for $241,307.62. Doris began receiving $2,000 per month beginning January 5, 1995.

In June 2009 the children filed suit, claiming damages of $642,484.99. In their second-amended petition, they asserted the following claims:

- Count I: breach of contract and conversion by Doris.
- Count II: breach of agency duties by Breault and his firm.
- Count III: vicarious liability of Lincoln National for Breault's conduct.
- Count IV: breach of contract by Lincoln National.
- Count V: conversion by Lincoln National.
- Count VI: failure of Lincoln National to inform the joint account owner of account activity.

The children moved for summary judgment against Doris and ultimately were awarded a judgment of $321,242.49 against her. That summary judgment proceeding is separate and apart from the issues presented in this appeal.

## Uncontroverted Facts

This brings us to the summary judgment motions filed by Lincoln National and Breault and his firm, which we must consider de novo. Turning to the parties' statements of uncontroverted facts, we first note that the defendants are united in interest with respect to the issues raised in the defendants' summary judgment motions and at stake in this appeal: whether the children's claims are barred by the applicable statutes of limitation or statutes of repose. Accordingly, we will combine the uncontroverted facts they set forth in the various briefs to determine whether there remains any genuine issue of material fact and whether under the uncontroverted facts these defendants are entitled to judgment as a matter of law. (We have no response in the record from Lincoln National addressing the children's statement of additional uncontroverted facts asserted in their response to Lincoln National's summary judgment motion, so we consider those additional facts as uncontroverted.) We have paraphrased the uncontroverted facts and placed them in chronological order as follows, with the caveat that not all of them may be relevant to the issues before us:

1. Breault recommended that Doris and Phillip, her stepson, purchase the Lincoln National annuity. Breault met with representatives of the children only once: when the decision was made to buy the Lincoln National annuity.
2. Doris and Phillip applied for the annuity contract on December 14, 1994, and the annuity was issued December 16, 1994. Breault set up the annuity account on terms designed to effectuate the family settlement agreement. The Lincoln National annuity conformed to the order of the district court and to the family settlement agreement. (We accept this as uncontroverted for purposes of the motions, though the annuity seems to be at odds with the family settlement agree-

ment to the extent that a contract rider appears to disenfranchise Phillip as a coowner.)

3. Breault was both the sales agent and the servicing agent on the account. He received a commission of $11,341.46 when the annuity was issued and thereafter received quarterly "trail commissions" of .25% of the account value beginning in the second year of the annuity.

4. Phillip was a joint owner of the annuity with Doris and was also an irrevocable beneficiary along with his four sisters. Phillip was age 28 at the time and had a high school education. He had no experience investing in securities or annuities and had no understanding of the agent's duties to him.

5. Under the terms of the annuity, none of the beneficiaries had any right to recover anything or take any action on the contract during Doris' life. (The children controvert this because they claim it is not a statement of fact but a legal conclusion.)

6. Breault assisted Doris in handling issues she had with the administration of payments during the life of the annuity. None of the children asked Breault for financial guidance after he initially sold the annuity. Breault received statements from Lincoln National during the life of the annuity.

7. The Lincoln National annuity is considered a security under the Securities Act of 1933. Under the rules of the National Association of Securities Dealers (NASD) a securities firm is required to provide notices of account activity on a quarterly basis. Breault was required to be a NASD member to sell this annuity.

8. Lincoln National was required to send a report to the owners of the annuity at least once each year. Lincoln National did not include Phillip's address in the relevant account information. Lincoln National never mailed any statements or correspondence to Phillip.

9. The family settlement agreement required the signature of both owners to change investment allocations. Breault changed investment allocations in the annuity but without obtaining the signature of Phillip for the changes.

10. Doris told Breault she wanted to move the policy.

11. On November 1, 1997, Doris wrote to Lincoln Life and said she was dissatisfied with Breault and Lincoln Life would be hearing from him in the near future. Doris fired Breault about that time or shortly thereafter.
12. Breault's firm received its last "trail commission" on December 31, 1997.
13. Doris cashed in the annuity on March 12, 1998. Lincoln National paid Doris the value of the account. Lincoln National did not obtain the consent of Phillip or of any of his siblings to terminate the annuity. Breault received notice that Doris had surrendered the annuity. He did not notify Phillip of this event.
14. A broker with Equiselect gave Doris help and advice in moving the money from the annuity account.
15. Doris spent all the money obtained from cashing in the annuity.
16. Rene Dunn learned that Doris had terminated the annuity when she first inquired about the annuity in February or March 2009.
17. The children filed this suit on June 19, 2009. They claim Lincoln National breached the annuity contract and Lincoln National is vicariously liable for Breault's conduct. The children also claim that Breault and his firm had a broker/customer relationship with Doris and Phillip. They claim that Breault fraudulently concealed or acted with reckless disregard (1) in failing to provide Lincoln National with information about the probate estate and its terms and (2) in failing to notify the children when Doris cashed in the annuity. Breault strenuously denies these claims.

## DISCUSSION

### Ripeness

As a preliminary matter, the defendants assert that this case is not ripe because the irrevocable beneficiaries have no rights to the funds in the annuity until Doris' death. But in oral argument they apparently abandon this point and request that we decide the case

on the merits of their defenses under the statutes of limitation and statutes of repose. We will do so.

*Statutes of Limitation and Statutes of Repose*

The children's claims arising out of the annuity contract are subject to the 5-year limitation period found in K.S.A. 60-511(1): "The following actions shall be brought within five (5) years: (1) An action upon any agreement, contract or promise in writing." They also bring claims that are limited by the 2-year limitation period found in K.S.A. 60-513(a), which provides:

"(a) The following actions shall be brought within two years:
. . . .
(2) An action for taking, detaining or injuring personal property, including actions for the specific recovery thereof.
(3) An action for relief on the ground of fraud, but the cause of action shall not be deemed to have accrued until the fraud is discovered.
(4) An action for injury to the rights of others, not arising on contract, and not herein enumerated."

The 2-year statute of limitations, K.S.A. 60-513, also contains a statute of repose:

"(b) Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, *but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action*." (Emphasis added).

The defendants assert that K.S.A. 60-513(b) precludes the children's claims. However, the children's contract claims are not controlled by K.S.A. 60-513(b). The limitation period for claims on a written contract is found in K.S.A. 60-511, which contains no statute of repose.

Statutes of limitations and statutes of repose express distinct concepts under the law. *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, 662, 831 P.2d 958 (1992); see *Martin v. Naik*, 43 Kan. App. 2d 591, 595-97, 228 P.3d 1092 (2010), *rev. granted on other grounds* 291 Kan. 911 (2011) (pending). A statute of limitations is

remedial and procedural, while a statute of repose is substantive. *Harding*, 250 Kan. 655, Syl. ¶¶ 6, 7. A statute of limitations creates a procedural barrier to bringing an action after a stated number of years. Once the time period in a statute of limitations has expired, the claim still exists but the plaintiff is barred from obtaining any relief on it. However, because it is procedural in nature, the statute of limitations is waived by a defendant who fails to assert it. In contrast, a statute of repose entirely extinguishes the cause of action after the passage of time even if the cause of action has not yet accrued. See *Four Seasons Apts. v. AAA Glass Service, Inc.*, 37 Kan. App. 2d 248, 251-52, 152 P.3d 101 (2007).

A statute of limitations that predicates the accrual of a cause of action on its discoverability generally includes a statute of repose that prevents the period for bringing suit from being open-ended. The statute of repose completely extinguishes the cause of action after a period of time. A cause of action for breach of a written contract, which is controlled by the 5-year limitation period found in K.S.A. 60-511(1), accrues at the time of the breach, regardless of when the breach is discovered or is discoverable. See *Four Seasons*, 37 Kan. App. 2d at 253-54. For this reason, there is no need for a statute of repose, and none exists with respect to breach of contract claims.

On the other hand, certain tort actions controlled by the 2-year limitation period found in K.S.A. 60-513(a) do not accrue until the fact of injury is discoverable. K.S.A. 60-513(b). To avoid an open-ended time for bringing such actions, the legislature has created a statute of repose in K.S.A. 60-513(b) that imposes a 10-year drop-dead date for commencing the action.

*Equitable Estoppel*

■ *Statutes of Limitation—Contract Claims Against Lincoln National*

The children claim that the doctrine of equitable estoppel bars the statutes of limitation from providing a basis for summary judgment on their contract claims against Lincoln National because Lincoln National failed to send yearly statements and legal notices to Phillip, the coowner of the annuity.

Doris surrendered the annuity in March 1998. This action was commenced more than 11 years later in June 2009. One of the beneficiaries, Rene, was the first to discover that Doris had cashed in the annuity. She discovered this in February or March 2009. According to the children, had Lincoln National kept Phillip informed of what Doris was doing, the children would have realized what their stepmother was up to and could have taken timely action. Thus, they argue, the doctrine of equitable estoppel should bar the running of the 5-year statute of limitations on their breach of contract claim.

As noted earlier, there is no statute of repose that sets a drop-dead date for commencing a breach of contract action because the cause of action accrues at the time of the contract's breach and the statute provides no escape hatch. But by common law we have adopted the doctrine of equitable estoppel in Kansas. The immediate question is whether the doctrine extends to circumstances such as those presented here. This calls for a review of the caselaw as it developed over the decades. As stated in *Safeway Stores v. Wilson*, 190 Kan. 7, 12, 372 P.2d 551 (1962):

> "There is no definite rule governing estoppel which can be applied to every situation. There are few, if any, relationships, of which the law takes cognizance, which are not [a]ffected to some degree by the principles of estoppel. Since the principle of equitable estoppel runs through all transactions it cannot be determined by any fixed or definite rule. Where the question is raised each case must be determined on its own individual facts."

Because the basis for invoking the doctrine of equitable estoppel is so very fact intensive, it is important that we understand the factual context in which various pronouncements about equitable estoppel have been made in cases having something to say about the issue before us. We do not include in this review a case cited by the defendants, *Kelly v. VinZant*, 287 Kan. 509, 197 P.3d 803 (2007), because it discusses fraud but not equitable estoppel. Further, it does not appear that the estoppel principle has been applied with steadfast consistency over the years. Nevertheless, we press on.

### 1959

In *Rex v. Warner*, 183 Kan. 763, 332 P.2d 572 (1959), Warner needed funds in addition to his first mortgage loan proceeds in order to buy his new home. Rex, Warner's employer, agreed to loan Warner the difference in exchange for a promissory note secured by a second mortgage on the property. At the closing, and through an apparent oversight, Warner and his wife failed to execute the note and second mortgage. When Rex discovered the oversight, he requested that the Warners execute the documents. Warner agreed, but his wife refused to do so. After two other requests spread over several years, Warner stated that while he had signed the documents his wife had not and would not sign them. Rex sued for specific performance of the oral contract to execute and deliver the note and mortgage. Warner contended the action was barred by the 3-year statute of limitations on oral contracts. Rex countered that equitable estoppel barred reliance on the statute of limitations. Rex prevailed, and on appeal the court stated:

"While this court recognizes the doctrine of equitable estoppel *in pais* to prevent a resort to the statute of limitations, and that a debtor or defendant may, by his representations, promises, or conduct, be estopped to assert the statute where other elements of estoppel are present [citations omitted], we do not believe the facts alleged are sufficient to invoke that doctrine in the instant case. . . . Generally speaking, an actual fraud in the technical sense, bad faith, or an attempt to mislead or deceive is not essential to create such an estoppel; to invoke the doctrine, the debtor or defendant must have done something that amounted to an affirmative inducement to plaintiff to delay bringing the action. [Citations omitted.]

". . . It was within plaintiff's domain to ascertain why the defendants refused to perform and where the means of knowledge with respect to his rights or liabilities are available to him, he may not ignore the requirement of due care and at the same time invoke the doctrine of equitable estoppel. That doctrine is not available for the protection of one who has suffered loss solely by reason of his own acts or omissions. Equity aids the vigilant and not those who slumber on their rights. [Citation omitted.]" 183 Kan. at 770-72.

### 1964

In *Klepper v. Stover*, 193 Kan. 219, 392 P.2d 957 (1964), Stover leased property to Murray. Murray assigned the lease to Kendall, who reassigned the lease to the Citizens State Bank, which reassigned the lease to the plaintiff. The lease from the outset con-

tained an error in the legal description. Plaintiff sued to reform the legal description in the lease, claiming that in good faith he erected improvements on the property and paid the rent for a number of years. The original parties to the lease and the various assignees were unaware of the error until the plaintiff had a survey prepared in anticipation of making additional improvements. Plaintiff claimed the defendants were estopped to raise the statute of limitations as a defense. The defendants moved to strike these allegations, the district court declined to do so, and the defendants appealed.

On appeal, the Supreme Court, citing *Rex*, 183 Kan. at 771, noted that " 'to invoke the doctrine, the debtor or defendant must have done something that amounted to an affirmative inducement to plaintiff to delay bringing the action.' " *Klepper*, 193 Kan. at 221. The *Klepper* court also stated:

"To apply the doctrine of estoppel to defendants here upon the ground of the statute of limitations requires an element of deception upon which the plaintiff acted in good faith in reliance thereon to his prejudice whereby he failed to commence the action within the statutory period. Whether the acts, promises, or representations of defendants lulled plaintiff into a sense of security, preventing him from filing suit before the running of the statute is a question of fact. (34 Am. Jur., Limitation of Actions, § 412, pp. 324, 325.)

"If a defendant, electing to rely on the statute of limitations, has previously by deception or in violation of his duty toward plaintiff, caused him to subject his claim to the statutory bar, defendant must be charged with having wrongfully obtained an advantage which the court will not allow him to hold, and this can be done by his silence when under an affirmative duty to speak. (53 C.J.S., Limitations of Actions, § 25, Estoppel, pp. 963, 964.)" 193 Kan. at 222.

The court concluded that "we believe there are sufficient allegations in plaintiff's petition to allege an equitable estoppel against defendants' attempt to invoke the statute of limitations as a bar to plaintiff's cause of action. [Citations omitted.]" 193 Kan. at 222.

### 1970

In *Bruce v. Smith*, 204 Kan. 473, 464 P.2d 224 (1970), Herbert and Carol Bruce sued Smith for damages to the Bruces' couch when it was sent to A&A Duraclean Service for cleaning. Smith had sold the business to Magdaleno the month before this trans-

action. Smith contended that Magdaleno owned A&A when the work was done and that Smith had no connection with the business at the time. But Carol Bruce presented evidence that she talked to a person who was identified as Smith about the cleaning job, he satisfied her that A&A could handle it, and he made arrangements to pick up the sofa. When the sofa came back damaged, a person believed to be Smith came to the Bruces' house to examine it and made recommendations for corrective action, "but alas, to no avail!" 204 Kan. at 475.

On appeal, the court noted regarding the estoppel issue:

"While it is true the record discloses no affirmative statements of ownership made by Mr. Smith to Mrs. Bruce, silence itself may give rise to an estoppel where, under the existing circumstances, there should have been a disclosure. Where a duty to speak exists, silence is tantamount to dissimulation. (28 Am. Jur. 2d, Estoppel and Waiver, § 53, pp. 665, 666.) We believe this rule fits the facts of this case." 204 Kan. at 477.

### 1977

In *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 561 P.2d 792 (1977), Wild West sold a car to Kathleen and Ronald Lorg and financed the sale for them. They assigned the note and security agreement to the bank and warranted to the bank that the buyers were over age 21 and had the legal capacity to contract. If the warranty was breached, Wild West was required to repurchase the note. Wild West mistakenly told the bank that Ronald Lorg was age 41. The bank agreed to purchase the note and security agreement. The Lorgs quickly defaulted and wrecked the car. Kathleen declared bankruptcy, and Ronald disclosed that he was age 17 at the time of the purchase and disaffirmed the purchase contract pursuant to K.S.A. 38-102 (Weeks). The bank sued Wild West and, after a trial to the court, obtained a judgment against Wild West for breach of the warranty.

Wild West argued that the bank was estopped from asserting its rights under the warranty because the bank knew Ronald's true age. The court observed:

"A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to

believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. (*Wichita Federal Savings & Loan Ass'n v. Jones*, 155 Kan. 821, 130 P.2d 556; 31 C.J.S., Estoppel, § 59, p. 367.)" *United American State Bank & Trust Co.*, 221 Kan. at 527.

Wild West's estoppel argument failed because the trial judge determined that the bank did not know Ronald's true age when it agreed to purchase the note and security agreement, and that finding was support by substantial competent evidence. 221 Kan. at 527.

### 1978

*Bowen v. Westerhaus*, 224 Kan. 42, 578 P.2d 1102 (1978), involved a dispute between two insurance companies regarding a car that was destroyed in a fire. Bowen, insured by Farmers Insurance Group, left his car with Westerhaus for repairs. Westerhaus was insured by Universal Underwriters Insurance Company. Westerhaus' garage caught fire and Bowen's car was destroyed in January 1971. Farmers paid Bowen for the loss and became subrogated to Bowen's rights. Farmers made claim for the loss caused by Universal's insured. Universal responded that there was a dispute between Universal and Travelers Insurance Company over which company had primary coverage for the loss, and the Insurance Commissioner was sorting it out. Over a year later, Universal told Farmers that it had always been ready to pay half of the Bowen loss but Travelers was unwilling to pay its half. As a result, Universal was filing a declaratory judgment action to resolve the coverage issue. In December 1973, Universal advised Farmers that the declaratory judgment action was still pending and it hoped to get an answer within 90 days. The statute of limitations ran in January 1974. Universal and Farmers continued to communicate with each other. In June 1974, after learning the declaratory judgment action had been decided adversely to Universal, it notified Farmers that the 3-year statute of limitations had run on the claim and Farmers was out of luck.

Farmers filed suit on its subrogation claim in Bowen's name and asserted that Universal and Westerhaus, its insured, were barred

by equitable estoppel from raising the statute of limitations defense. Westerhaus moved for summary judgment based upon the statute of limitations. The court granted the motion.

On appeal the court reversed, finding there remained a genuine issue of material fact which preclude summary judgment. The court relied on *Safeway Stores* and stated that the conduct giving rise to an estoppel "generally raises a question of fact unless the facts are stipulated to or depend upon the interpretation of unambiguous written documents." *Bowen*, 224 Kan. at 48 (citing Annot., 39 A.L.R.3d 127). The record contained written documents, letters exchanged by the insurers, but there remained a dispute as to their import, and the court was required to consider these letters in the light more favoring the nonmoving party. 224 Kan. at 49; see *Osterhaus v. Toth*, 291 Kan. 759, Syl. ¶ 1, 249 P.3d 888 (2011).

*Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136 (1978), was a derivative action in which estoppel and the statute of limitations arose in a scenario which is the reverse of what is usually presented. In *Newton* the plaintiff claimed the defendants took excessive management fees and salaries, misappropriated corporate assets, and diverted business opportunities to themselves to the detriment of the corporation. The defendants claimed that plaintiff, a director of the corporation, had the duty to keep himself reasonably apprised of the status of the corporation, including the various transactions at issue, and should be estopped from bringing this action which is barred by the statute of limitations. The plaintiff argued that estoppel was not available to the defendants because they hid the true facts from him. The trial court found that the defendants concealed the facts giving rise to the claim. On appeal, the Supreme Court concluded that the defendants could not rely on the estoppel defense, reasoning that estoppel is for the protection of innocent persons and only they can invoke it. "One cannot take advantage of . . . estoppel and the statute of limitations where his own concealment is the basis for the delay." 224 Kan. at 516.

### 1979

*Coffey v. Stephens*, 3 Kan. App. 2d 596, 599 P.2d 310 (1979), arose out of a January 1970 automobile collision. Stephens' insurer

paid for Coffey's property damage, and the adjuster admitted that the accident was Stephens' fault. A series of adjusters told Coffey that her claim would be settled when she was released by her doctor. Coffey hired an attorney 8 months before the 2-year statute of limitations ran. Negotiations were delayed while Coffey's attorney collected her medical records. Coffey ultimately filed suit in June 1972, several months after the 2-year statute of limitations had run. Coffey argued that Stephens was estopped to assert the statute of limitations due to the conduct of his insurer. The issue was submitted to the jury, which found in favor of Stephens.

On appeal the appellate court affirmed, concluding that "the mere fact that liability had been admitted and a proposal made to negotiate a settlement in the future does not alone obviate the necessity of filing a suit within the period required by the statute." 3 Kan. App. 2d at 598. The court noted:

"One general statement of the [equitable estoppel] document which runs throughout the cases in which it is asserted is that a defendant, who has acted in such a fashion that his conduct is sufficient to lull his adversary into a false sense of security forestalling the filing of suit until after the statute has run, will be precluded from relying on the bar of the statute. [Citations omitted.]" 3 Kan. App. 2d at 598.

### 1982

In *Levi Strauss & Co. v. Sheaffer*, 8 Kan. App. 2d 117, 650 P.2d 738 (1982), Sheaffer operated a men's apparel store in the Aggieville area of Manhattan. Clark, a Levi salesman, told Sheaffer that if he took on the Levi line and bought up to his credit limit, Clark would see to it that Sheaffer would have no competing Levi retailers in his area. Sheaffer agreed, closed out other lines of men's apparel, and remodeled his store to complement the Levi lines. Clark moved on after a year and was replaced by other Levi salesmen. Sheaffer reminded them of Clark's promise about protecting his territory, and none said they would not work to ensure Sheaffer's exclusive dealership in Aggieville.

When a competing retailer began carrying the Levi line, Sheaffer complained to various levels of the Levi management but got the runaround. This runaround included affirmative representations to Sheaffer that "as far as the [Levi salesman] was concerned, Sheaf-

fer's was the only account for Levi in Aggieville. He said he would take care of the matter." 8 Kan. App. 2d at 120. At a meeting in Levi's San Francisco headquarters, a Levi manager "told Sheaffer that he would look into the matter and take care of it." 8 Kan. App. 2d at 120. Ultimately, Levi sued Sheaffer on his open account, and Sheaffer counterclaimed for breach of the claimed oral exclusive dealership contract. The district court concluded that equitable estoppel barred Levi from relying on the statute of limitations defense. The district court found that

" '[w]hile it is true the evidence does not show express promises were made to Sheaffer by the salesmen . . . Sheaffer was led to believe that he was to have the exclusive right to sell Levis in . . . Aggieville. . . . Perhaps most damaging to the plaintiff's position that no exclusive dealership was intended is the failure of the Levi sales representatives or administration to disclaim Sheaffer's claim of exclusive dealership.' " 8 Kan. App. 2d at 123.

Sheaffer prevailed at trial on his counterclaim, and Levi appealed, claiming the district court's findings were insufficient to support the court's finding of equitable estoppel. The appellate court affirmed, noting the definition of equitable estoppel which includes " 'acts, representations, admissions, *or silence* when it has a duty to speak.' " 8 Kan. App. 2d at 124.

### 1983

*Iola State Bank v. Biggs*, 233 Kan. 450, 662 P.2d 563 (1983), involved the bank's suit to collect on a personal guaranty. The parties filed cross-motions for summary judgment, and the court found that Dolores Bybee's 1975 guaranty agreement covering the obligations of Biggs Feed & Grain, Inc., was enforceable against her, but that two 1974 guaranties for Joe and Jan Biggs, d/b/a/ Biggs Feed & Grain (collectively "Biggs"), were not. The bank appealed.

The Biggs were the son-in-law and daughter of Jack and Dolores Bybee. In 1974 Jack and Delores executed guaranties for the bank's loans to Joe and Jan. In 1975 Joe and Jan incorporated their grain business, and Jack and Delores executed another guaranty for the bank to enable the new corporation to obtain a line of credit. The following month, the bank consolidated the prior individual loans

to Joe and Jan into one corporate obligation, relieving Joe and Jan of personal liability on those preincorporation loans.

In 1981 the bank sued to collect on the corporation's debt and to enforce the guaranties. Joe and Jan filed bankruptcy, and Jack died, leaving Dolores holding the bag. Dolores admitted liability on the 1975 guaranty but claimed the incorporation of the business and the new guaranty in 1975 extinguished the two prior guaranties in 1974. The bank claimed that Dolores was equitably estopped to deny her obligations on the 1974 guaranties because Dolores submitted financial statements to the bank after the business was incorporated and each statement listed as a liability her two preincorporation guaranties of the personal debts of Joe and Jan. The Supreme Court stated:

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightly relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citation omitted.]" 233 Kan. at 458.

It was uncontroverted that Dolores performed no act upon which the bank could rely because she neither read nor signed the financial statements submitted to the bank. (Apparently Jack must have submitted the financial statements to the bank.) The Supreme Court concluded that the trial court was correct in finding no estoppel. 233 Kan. at 458-59.

### 1984

In *Turon State Bank v. Bozarth*, 235 Kan. 786, 684 P.2d 419 (1984), a farmer financed his farm operation through the local bank. He secured the debt with his cattle, crops, and machinery. In 1980 he sought an additional loan for funds to sow his spring crops. Because the security for his existing loan would not cover this new loan, he was required to have his son-in-law cosign the note. In 1981 the farmer sold some cattle and deposited the money in the bank and asked the bank to apply most of it to the note

cosigned by his son-in-law, but the bank applied most of the cattle sale proceeds to the farmer's original debt. When the farmer went bankrupt, the bank sued the son-in-law on the outstanding note he cosigned. The son-in-law responded that the bank was supposed to have deposited the cattle sale proceeds as the farmer requested, but failed to do so. The trial court found that the bank was estopped to deny application of the funds to the son-in-law's note.

When the farmer asked the bank to apply the cattle proceeds against the cosigned note, the bank did not tell the farmer one way or another how it would handle the transaction, but it proceeded to apply the funds to the original debt. The issue before the Supreme Court was whether the bank was estopped by its silence. Quoting 28 Am. Jur. 2d, Estoppel and Waiver, § 53, pp. 669-70, the court recited the general rule:

" 'In general, a person is required to speak only when common honesty and fair dealing demand that he do so, and in order that a party may be estopped by silence, there must be on his part an intent to mislead, or at least a willingness that others should be deceived, together with knowledge or reason to suppose that someone is relying on such silence or inaction and in consequence thereof is acting or is about to act as he would not act otherwise.' " 235 Kan. at 790.

The court observed that over the years the farmer discussed with the bank how to apply the proceeds of cattle and crop sales to the farmer's bank debts, but that it was the practice of the parties that the bank would make the final determination. The court noted that the bank did not mislead the farmer but applied the cattle sale proceeds to the loan that generated the proceeds. "There is no basis for the defense of equitable estoppel. There is no showing the bank by its acts, representations, admissions, or silence induced the [farmer or his son-in-law] to believe certain facts existed upon which they detrimentally relied and acted. [Citation omitted.]" 235 Kan. at 792.

### 1997

In *Robinson v. Shah*, 23 Kan. App. 2d 812, 936 P.2d 784 (1997), the defendant performed abdominal surgery on the plaintiff. The plaintiff had ongoing gastric distress. The defendant had diagnostic x-rays taken of the plaintiff, and the radiologist reported to the

defendant that the x-rays showed that surgical sponges had been left in the plaintiff's abdomen during the surgery. The defendant failed to disclose this to the plaintiff and, after a decade of ongoing distress, the plaintiff, now under the care of a different doctor, discovered the presence of the sponges. The plaintiff sued the defendant for fraud and medical malpractice. The district court dismissed the plaintiff's claims based upon the statute of limitations. The appellate court reversed, citing many of the equitable estoppel cases discussed above in concluding that "the defendant in a malpractice case cannot take advantage of a defense based on the statute of limitations or the statute of repose where the defendant's own fraudulent concealment has resulted in the delay in discovering the defendant's wrongful actions." 23 Kan. App. 2d at 832.

These cases teach us that fraud, bad faith, or the intent to deceive is not essential to create an estoppel. *Rex v. Warner*, 183 Kan. 763, 770-72, 332 P.2d 572 (1959). But using equitable estoppel to bar application of the statute of limitations requires an element of deception. *Klepper*, 193 Kan. at 222. A common factual thread running through the cases is conduct by a party that lulls the adverse party into a false sense of security, forestalling the filing of suit until the statute has run. *Coffey*, 3 Kan. App. 2d at 598. On the other hand, equitable estoppel can arise from a party's silence when that party had a duty to speak. *United American State Bank*, 221 Kan. at 527; *Iola State Bank*, 233 Kan. at 458; *Bruce*, 204 Kan. at 477; *Levi Strauss*, 8 Kan. App. 2d at 124. But in order to be estopped by silence, the defendant must have the intent to deceive, or at least a willingness that others would be deceived, and reason to believe that others would rely on such silence. *Turon State Bank*, 235 Kan. at 790.

Further, equitable estoppel generally involves questions of fact and when the facts are disputed or when necessary facts come from ambiguous documents, summary judgment is inappropriate and the factual dispute must await resolution at trial. *Bowen*, 224 Kan. at 48; *Safeway Stores v. Wilson*, 190 Kan. 7, 12, 372 P.2d 551 (1962). But when the facts are undisputed, the district court may rule on the availability of the doctrine as a matter of law. *Rex*, 183 Kan. at 769.

Here, we find no genuine issue of material fact on the estoppel issue that must await trial for final resolution of the children's contract claims against Lincoln National. Thus, the issue becomes one of law: Under the uncontroverted facts does the doctrine of equitable estoppel apply?

The children do not claim that they were lulled into a false sense of security by any action by Lincoln National; rather, they claim the estoppel arises from Lincoln National's silence when it had an obligation to speak. That silence arises in two contexts: (1) Lincoln National's failure to provide Phillip with periodic reports as it was required to do and (2) its failure to notify Phillip when Doris cashed in the annuity.

With respect to the periodic reports, the children cannot contend that they were lulled into a false sense of security from not hearing from Lincoln National. After all, had Phillip received quarterly reports during the life of the annuity, he would not have acted upon them by bringing this action sooner. In fact, Lincoln National's failure to provide the first periodic report in the first year of the contract put Phillip on notice that Lincoln National had breached the contract and that pursuant to K.S.A. 60-511(1) he had 5 years to seek relief through the courts.

With respect to Lincoln National's failure to notify Phillip when Doris cashed in the annuity, we take note of the "Joint/contingent Ownership" provision in a rider to the annuity contract which gave Doris the right to unilaterally cash in the annuity. The rider provides: "If joint owners are named in the application such joint owners shall be treated as having equal undivided interests in the Contract. Either owner, independent of the other, may exercise any ownership rights in this Contract." From the children's perspective, the nonreported event that they wished they had known about sooner was Doris cashing in the annuity. But they do not direct us to any provision in the contract that requires Lincoln National to report to anyone upon termination of the annuity contract. Silence can be the basis for equitable estoppel when the defendant has the duty to speak but fails to do so. While the children cite the contract provision that provides for periodic reports during the life of the contract, they do not direct us to any contract provision that re-

quired Lincoln National to inform Phillip that Doris had terminated the contract by cashing in the annuity.

Further, the cases teach us that Lincoln National must have intended to deceive the children or at least harbored a willingness that the children would rely upon and be deceived by its silence. We find no support for that notion here. The annuity contract, Section 1.04(f), and the variable annuity amendment to the contract contain a schedule of investment advisory fees. The decision to cash in the annuity was made by Doris alone. It was not in Lincoln National's pecuniary interest for Doris to cash in the annuity or for the children not to dissuade her from doing so. There is certainly no evidence that Lincoln National remained silent in order to deceive the children or lull them into a false sense of security.

Finally, it is uncontested that Phillip was on notice of Lincoln National's contractual duty to provide periodic reports but took no action to inquire when none was received. As stated in *Rex,*

"he may not ignore the requirement of due care and at the same time invoke the doctrine of equitable estoppel. That doctrine is not available for the protection of one who has suffered loss solely by reason of his own acts or omissions. Equity aids the vigilant and not those who slumber on their rights." 183 Kan. at 771-72.

Based upon the uncontroverted facts, we conclude that the children were not entitled to invoke the doctrine of equitable estoppel to defeat the statute of limitations on their breach of contract claims against Lincoln National. Lincoln National is entitled to summary judgment on the children's contract claims against it.

■ *Statutes of Repose—Tort-Based Claims Against Lincoln National*

As discussed earlier, statutes of repose are found in tort-based statutes of limitation which predicate commencement of the running of the statutory period on the discoverability of the tort. Here, the children contend that Lincoln National is equitably estopped from raising the statute of repose to bar its claims of conversion and vicarious liability because claims grounded in fraud or concealment are excepted from the statute of limitation and the statute of repose. They assert that "[t]he theory of equitable estoppel is

closely allied with the allegations of fraudulent concealment." As a basis for the claims, the children allege that Lincoln National remained silent when it had a duty to speak, thus leaving them without a remedy for the wrongs committed.

Finally, the children state in a conclusory manner, without case support or argument, that although their claim of vicarious liability for the breach of fiduciary duty of Breault and his firm is based in tort, the theory of equitable estoppel should apply even if the statute of repose is implicated.

The children's tort claims are subject to the 2-year limitation period set forth in K.S.A. 60-513(a)(2). Their claims of conversion and breach of fiduciary duty are governed by a 10-year statute of repose. K.S.A. 60-513(b). These claims clearly fall outside of the limits set by the statutes.

Whether the doctrine of equitable estoppel is even available to toll a statute of repose is a debatable issue in Kansas. The majority in *Robinson*, discussed above, and the court in *Stark v. Mercantile Bank, N.A.*, 29 Kan. App. 2d 717, 724, 33 P.3d 609 (2000), concluded that "[f]raud and fraudulent concealment either toll the statute of repose or make it inapplicable." But Judge Knudson, expressing the minority view in *Robinson*, noted the fundamental difference between statutes of limitation, which extinguish the right to pursue a cause of action, and statutes of repose, which extinguish the cause of action itself. He reasoned that equitable estoppel cannot bar application of a statute of repose. *Robinson*, 23 Kan. App. 2d at 834-35 (Knudson, J., dissenting). We need not weigh in on that debate.

If the doctrine of equitable estoppel applies to the statute of repose with respect to the children's tort-based claims, the children must satisfy the same burden they faced in confronting the statute of limitations defense to their contract claims. As discussed earlier, based upon the uncontroverted facts the children have failed to establish that they are entitled to invoke the doctrine. The children's tort-based claims against Lincoln National are barred by the applicable statute of repose, and Lincoln National is entitled to summary judgment on those claims.

■ *Statute of Limitations—Breach of Fiduciary Duty Claims against Breault and His Firm*

The children contend that Breault and his firm are equitably estopped to raise the statute of limitations as a defense to the children's claims of breach of fiduciary duties. These claims are subject to the 2-year statute of limitation as set forth in K.S.A. 60-513(a)(2). The children contend that the controlling statute of limitations for breach of fiduciary duty is 3 years under K.S.A. 60-512 because the relationship was one formed as the result of a contract as well as one implied by law. Regardless, the children failed to commence this action within either statute of limitations.

Based on the uncontroverted facts it is clear that there was no ongoing fiduciary relationship upon which the children could predicate these claims. Breault recommended that Doris and Phillip purchase the Lincoln National annuity. Breault met with representatives of the children only once: when the decision was made to buy the Lincoln National annuity. Breault set up the Lincoln National account on terms designed to effectuate the family settlement agreement. The annuity conformed to the order of the district court and to the family settlement agreement.

Breault received a sales commission when the annuity was purchased and an ongoing commission thereafter during the life of the annuity. He assisted Doris in handling issues she had with the administration of payments during the life of the annuity but he had no ongoing contact with the children. None of the children asked Breault for financial guidance after he initially sold the annuity.

As the court determined in *Daniels v. Army National Bank*, 249 Kan. 654, 656, 822 P.2d 39 (1991), a fiduciary relationship may be created by contract or implied in law due to the facts surrounding the transaction and the relationship between the involved parties. In *Linden Place v. Stanley Bank*, 38 Kan. App. 2d 504, Syl. ¶ 3, 167 P.3d 374 (2007), the court stated that in determining whether a fiduciary relationship exists, one must determine whether a "special confidence is placed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence."

There is evidence that could support a fiduciary relationship between Doris and Breault. Doris consulted with him on investments in the annuity, and Breault changed the investment allocation at her behest. But the relationship between Breault and the children after the annuity was purchased was nonexistent. None of the children asked Breault for any financial or investment advice after the annuity was purchased. Breault did not have any contact with the children after December 1994, more than 14 years before this suit was filed.

Regardless, in order to establish estoppel, the children must prove that they rightfully relied on Breault's and his firm's acts or omissions which lulled them into a false sense of security and caused them to delay bringing this action until the statute of limitations had expired. Again, as with the claims against Lincoln National, the children rely on Breault's silence, his failure to act, rather than any overt act. We apply the same analysis here that we used in considering the claims against Lincoln National.

There certainly is no evidence that Breault intended by his silence or inaction to deceive or to mislead the children. It is uncontroverted that Doris was dissatisfied with Breault before she cashed in the annuity. She fired Breault at or shortly after the time she cancelled the annuity. It was not in Breault's pecuniary interest for Doris to cash in the annuity. His motivation would have been for the children to dissuade Doris from terminating the annuity, not keeping Doris' intended actions a secret from the children. Doris relied on another brokerage firm, Equiselect, in moving the proceeds from the annuity account. In their statement of additional uncontroverted facts, the children do not assert any fact which, viewed in the light more favoring the children, suggest that Breault was instrumental in causing Doris to cash in the annuity. The uncontroverted facts do not justify the children invoking equitable estoppel as a bar to the application of the statute of limitations.

*Continuous Representation Doctrine—Tolling Claims Against Breault and His Firm*

For the first time on appeal, the children argue that the doctrine of continuing representation tolls the applicable statute of limita-

tions. They claim that Breault continued to change investment allocations throughout the life of the policy and they never terminated their relationship with Breault. Thus, they argue, under the continuing representation doctrine the statute of limitations did not run until the plaintiffs realized that the policy had been surrendered.

The continuous representation rule has been recognized in Kansas to toll the statute of limitations *only* in the context of legal malpractice claims. Depending on the facts and circumstances of each case, there are at least four theories which can apply to attorney malpractice to determine when the accrual of a cause of action occurs and the statute of limitations begins to run. One of those theories is the continuous representation rule. *Gansert v. Corder*, 26 Kan. App. 2d 151, 153-54, 980 P.2d 1032 (1999); *Pittman v. McDowell, Rice & Smith, Chtd.*, 12 Kan. App. 2d 603, 609, 752 P.2d 711, *rev. denied* 243 Kan. 780 (1988). Notably, the continuous representation rule does not toll statutes of repose. *Bonin v. Vannaman*, 261 Kan. 199, 228, 929 P.2d 752 (1996).

The purpose of the continuous representation rule is

" ' "to avoid unnecessarily disrupting the attorney-client relationship. Adoption of this rule was a direct reaction to the absurd requirement of the occurrence rule which requires the client to sue his attorney even though the relationship continues and there has not been and may never be any damage. The rule, limited to the context of continuous representation, is consistent with the purpose of the statute of limitations which is to prevent stale claims and enable the defendant to preserve evidence. Where the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided." ' " *Morrison v. Watkins*, 20 Kan. App. 2d 411, 417, 889 P.2d 140, *rev. denied* 257 Kan. 1092 (1995).

The children claim that the continuous representation rule was extended to medical malpractice claims in *Robinson*. See *Robinson*, 23 Kan. App. 2d 812. While the doctrine was raised in the previously mentioned separate opinion of Judge Knudson, the majority did not rely on the continuous representation rule. Further, our Supreme Court has explicitly stated that the continuous representation rule does not apply to medical malpractice cases. *Bonin*, 261 Kan. at 228.

In any event, we find no basis upon which to extend the continuous relationship rule to the facts of this case. The uncontroverted facts establish that there simply was no continuous relationship between Breault and the children after the annuity was purchased. The family purchased the annuity in December 1994. Breault or his firm had no further contact or relationship with Phillip or his siblings. In November 1997, Doris fired Breault and removed him as the servicing agent. This suit was filed in June 2009, almost 12 years later. The justification for applying the doctrine of continuous representation to the broker/client relationship would be to avoid disrupting the relationship between the investment advisor and his client. Here, there was no such relationship to disrupt. Even if the children were to ride Doris' coattails in her relationship with Breault, that relationship ended almost 12 years before the children brought this action. Even under this theory, the tolling would have ended and the limitation period would have commenced in November 1997. The continuous representation rule would not bar the effect of the statute of limitations.

*Fraudulent Concealment—Claims Against Lincoln National, Breault, and His Firm*

Finally, based upon the holding in *Robinson,* the children contend that the defendants' fraudulent concealment avoids the effect of the applicable statutes of limitations and statutes of repose. In their seconded-amended petition, the children allege that Breault fraudulently concealed the surrender of the policy in reckless disregard of their interests and Lincoln National is vicariously liable for Breault's actions. The children argue that *Robinson* supports their argument that fraudulent concealment is an exception to the statute of limitations.

As discussed earlier, the present case is readily distinguishable from the facts in *Robinson.* We have no evidence of fraudulent concealment here. We have none of the shameful conduct exhibited in *Robinson,* no intentional deception to protect the defendant from the legal consequences of his medical negligence. When Doris cancelled the annuity, the defendants gained nothing in the transaction and gained nothing by failing to advise Phillip about it.

In fact, Lincoln National lost its ongoing investment advisory fee, and Breault and his firm lost an ongoing commission when Doris cashed in the annuity. When Rene inquired about the annuity in 2009, Breault immediately informed them that Doris had surrendered the annuity in 1998.

We find no basis upon which to extend the rationale in *Robinson* to the uncontroverted facts now before us. When viewed in the light most favoring the children, the defendants' claimed acts of fraudulent concealment do not bar the effect of the applicable statutes of limitations and statute of repose.

In our de novo review we conclude that there is no genuine issue of material fact which prevents the applicable statutes of limitation and repose from constituting bars to the children's claims. The defendants are entitled to judgment as a matter of law. The district court did not err in so concluding.

Affirmed.